# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

| | |
|---|---|
| CITY OF MOSES LAKE, | 2:23-cv-02506 |
| Plaintiff, | Master Docket No. 2:18-mn-02873 |
| *v.* | Judge Richard M. Gergel |
| | MDL NO. 2873 |
| 3M COMPANY (f/k/a Minnesota Mining Manufacturing, Co,); TYCO FIRE PRODUCTS LP (successor-in-interest to the Ansul Company); AGC, INC. (f/k/a Asahi Glass Co., Ltd.); AGC CHEMICALS AMERICAS, Inc.; AMEREX CORPORATION; ARCHROMA MANAGEMENT LLC; ARCHROMA U.S., INC.; ARKEMA INC.; BASF CORPORATION; BUCKEYE FIRE EQUIPMENT COMPANY; CARRIER GLOBAL CORPORATION; CHEMDESIGN PRODUCTS, INC.; CHEMGUARD, INC.; CHEMICALS INCORPORATED; THE CHEMOURS COMPANY; THE CHEMOURS COMPANY FC, LLC; CHUBB FIRE, LTD.; CLARIANT CORPORATION; CORTEVA, INC.; DAIKIN AMERICA, INC.; DEEPWATER CHEMICALS, INC.; DUPONT DE NEMOURS, INC.; DYNAX CORPORATION; EIDP, Inc. (f/k/a E.I. DU PONT DE NEMOURS AND COMPANY); HONEYWELL INTERNATIONAL, INC.; HONEYWELL SAFETY PRODUCTS USA, INC.; KIDDE-FENWAL, INC.; KIDDE PLC, INC.; NATION FORD CHEMICAL COMPANY;  NATIONAL FOAM, INC. (successor-in-interest to Angus Fire Armour Corp.); RAYTHEON TECHNOLOGIES CORPORATION (f/k/a United Technologies Corporation); and UTC FIRE & SECURITY AMERICAS CORPORATION, INC., | **COMPLAINT AND JURY DEMAND** |
| Defendants. | |

The City of Moses Lake ("City"), by and through its attorneys, hereby alleges as follows:

## SUMMARY OF CLAIM

1.      The City brings this action for injunctive relief, damages and reimbursement of costs incurred, and which continue to be incurred, to address the presence of per- and polyfluoroalkyl substances ("PFAS")—including, but not limited to, perfluorooctanoic acid ("PFOA") and perfluorooctane sulfonate ("PFOS")—in the City's groundwater supply wells.

2.      PFAS, including PFOA and PFOS, are a group of toxic, extremely persistent, and bioaccumulative synthetic chemicals. When consumed, PFAS can cause serious health impacts.

3.      3M Company, AGC, Inc. (f/k/a Asahi Glass Co., Ltd.), AGC Chemicals Americas, Inc., Amerex Corporation, Archroma Management LLC, Archroma U.S., Inc., Arkema, Inc., BASF Corporation, Buckeye Fire Equipment Company, Carrier Global Corporation, ChemDesign Products, Inc., Chemguard, Inc., Chemicals Incorporated, The Chemours Company FC, LLC, The Chemours Company, Chubb Fire, Ltd., Clariant Corporation, Corteva, Inc., Daikin America, Inc., Dupont de Nemours, Inc., Deepwater Chemicals, Inc., Dynax Corporation, E.I. du Pont de Nemours & Co., Honeywell International, Inc., Honeywell Safety Products USA, Inc., Kidde PLC, Inc., Kidde-Fenwal, Inc., Nation Ford Chemical Company, National Foam, Inc., Tyco Fire Products LP, Raytheon Technologies Corporation (f/k/a United Technologies Corporation), and UTC Fire & Security Americas Corporation, Inc. (together, the "Defendants"), are responsible for PFAS released into the groundwater that supplies the City's public water supply system.

4.      For years, Defendants manufactured, sold, and/or distributed compounds and products containing PFAS. These products include the firefighting suppressant agent "aqueous film-forming foam" ("AFFF"), which contains PFAS and is used at airports and fire-fighting

training facilities.[1]

5.     Defendants knew that PFAS and related constituents present unreasonable risks to human health, water quality, and the environment. Yet they manufactured, distributed, and sold these chemicals with inadequate warning of their toxic effects. They did so without regard to the health of the City's residents or the City's property interests, both of which would foreseeably be damaged once these chemicals infiltrated the environment.

6.     Defendants marketed, distributed, and sold their AFFF with knowledge that it would be used in training exercises, fire control, fire suppression systems, emergency situations, and other ways at airports and fire-fighting training facilities.

7.     Defendants knew such use would release PFAS and other contaminants into the environment.

8.     Defendants'[2] acts and omissions contaminated the City's water supplies with PFAS. This contamination has spread to the Alluvial and Wapanum aquifers ("Aquifers"), from which the City draws water to supply its customers.

9.     Defendants' negligent development, manufacturing, distribution, marketing, and/or sale of AFFF caused the contamination of the City's groundwater and wells with PFAS.

10.     Through their development, manufacturing, distribution, marketing, and/or sale of AFFF; violations of the Model Toxics Control Act ("MTCA"), Chapter 70A.305 RCW; the Washington Consumer Protect Act ("CPA"), Chapter 19.86 RCW; and their trespass, nuisance, and negligence, the Defendants proximately caused the City's injuries and damages by

---

[1] Unless otherwise noted, all mentions of "AFFF" refer to AFFF containing PFAS, and includes the PFAS component parts of AFFF, including, but not necessarily limited to, PFOA, PFOS, PFNA, PFBS, and HFPO-DA.

[2] "Defendants" refers to all defendants named in this complaint, including manufacturers of AFFF, manufacturers of fluorochemicals utilized in AFFF, manufacturers of PFOA and PFOS precursors contained in AFFF, and distributors of AFFF that placed AFFF products into the stream of commerce.

COMPLAINT                    - 2 -

contaminating the groundwater.

11.     This action thus arises from the negligent, intentional, wrongful, and illegal acts and omissions by Defendants that contaminated the City's water supplies.

12.     As a result of Defendants' contamination of the City's water supplies, the City has and will continue to incur significant expenses and losses associated with continued water quality testing, designing and constructing filtration systems, removing wells from service, and otherwise responding to and mitigating the impacts of PFAS contamination in its drinking water supplies. The City is also at risk of losing, among other things, revenue and customers.

13.     Under common law, the City seeks injunctive relief requiring that Defendants, as necessary: to fund installation of granulated activated carbon ("GAC") filtration systems or other best remediation technology as determined by the City, and other infrastructure necessary to remediate PFAS in the City's affected wells and associated systems; build new wells that draw water from deeper aquifers unaffected by PFAS; remediate the soil underlying the Big Bend Community College ("BBCC") Air Rescue and Fire Fighting ("ARFF") burn facility, which has been used by BBCC for over forty years to conduct live aircraft fuel firefighting training, as necessary to prevent that potential major source of PFAS from entering the City's water supply; supply the City's customers with alternative water supplies unaffected by PFAS as necessary to meet demand.

14.     Under federal and state law set forth further below, the City also seeks from Defendants compensatory, consequential and incidental damages; restitution; declaratory judgment; and any additional appropriate relief.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction to hear the City's claims against the Defendants

pursuant to 28 U.S.C. § 1332, as the parties are completely diverse and the amount in controversy exceeds $75,000.

16.    This Court also has supplemental jurisdiction over the City's state law claims under 28 U.S.C. § 1367.

17.    In addition, the Declaratory Judgments Act, 28 U.S.C. § 2201, authorizes this Court to grant declaratory relief in this matter.

18.    Pursuant to the case management orders of this Court in Multi-District Litigation ("MDL") No. 2:18-mn-2873-RMG, including Paragraphs 25–29 of this Court's Case Management Order No. 3, dated April 26, 2019 (Dkt. 72), the City files this Complaint directly in this Court.

19.    For purposes of the claims alleged herein, the Eastern District of Washington shall be the District's home venue, defined as the proper venue of origin where the claim could have otherwise been brought under 28 U.S.C. § 1391, because a substantial part of the events giving rise to this Complaint occurred in that District. But for this Court's Case Management Order permitting direct filing in this MDL, the City would have filed in its home venue.

## PLAINTIFF

20.    Plaintiff City of Moses Lake ("City" or "Moses Lake") is a municipal corporation with its principal place of business at 401 South Balsam Street, Moses Lake, Grant County, Washington, 98837.

21.    The City is a municipal water purveyor with municipal water rights issued by the Washington State Department of Ecology. The City supplies drinking water to approximately 25,500 customers through an interconnected water supply and distribution system. Its water system is maintained and further regulated by the Washington State Department of Health.

22. The City's water is drawn from 18 active permanent groundwater wells in the Aquifers.

## DEFENDANTS

23. Defendant The 3M Company ("3M") (f/k/a Minnesota Mining and Manufacturing Co.) is a Delaware corporation. Its principal place of business is at 3M Center, St. Paul, Minnesota 55144-1000.

24. Defendant AGC, Inc. ("AGC") (f/k/a Asahi Glass Company, Ltd.) is a corporation organized under the laws of Japan and does business throughout the United States. AGC has its principal place of business at 1-5-1, Marunouchi, Chiyoda-ku, Tokyo 100-8405 Japan.

25. Defendant AGC Chemicals Americas, Inc. ("AGC America") is a Delaware corporation with its principal business office at 55 E. Uwchlan Avenue, Suite 201, Exton, Pennsylvania 19341. On information and belief, AGC America is a subsidiary of AGC, Inc., a Japanese corporation formerly known as Asahi Glass Company, Ltd.

26. Defendant Amerex Corporation ("Amerex") is an Alabama corporation and does business throughout the United States. Amerex has its principal business office at 2900 Highway 280 S, Suite 300, Birmingham, AL 35223.

27. Defendant Archroma Management, LLC ("Archroma Management") is a foreign limited liability company registered in Switzerland, with a principal business address of Neuhofstrasse 11, 4153 Reinach, Basel-Land, Switzerland.

28. Defendant Archroma U.S., Inc. ("Archroma U.S.") is a Delaware corporation with its principal place of business located at 5435 77 Center Dr., #10, Charlotte, North Carolina 28217. On information and belief, Archroma U.S., Inc. is a subsidiary of Archroma

Management, LLC.

29.     Defendant Arkema, Inc. ("Arkema") is a Pennsylvania corporation with its principal place of business at 900 1st Avenue, King of Prussia, Pennsylvania 19406.

30.     Defendant BASF Corporation ("BASF") is a Delaware corporation with its principal place of business at 100 Park Avenue, Florham Park, New Jersey 07932. On information and belief, BASF acquired Ciba-Geigy Corporation and/or Ciba Specialty Chemicals.

31.     Defendant Buckeye Fire Equipment Company ("Buckeye") is an Ohio corporation with its principal place of business at 110 Kings Road, Kings Mountain, North Carolina 28086.

32.     Defendant Carrier Global Corporation ("Carrier") is a Delaware corporation with its principal place of business located at 13995 Pasteur Boulevard, Palm Beach Gardens, Florida 33418. On information and belief, Defendant UTC Fire & Security Americas Corporation, Inc. ("UTC") is now a division of Carrier.

33.     Defendant ChemDesign Products, Inc. ("ChemDesign") is a Delaware corporation with its principal place of business located at 2 Stanton Street, Marinette, Wisconsin 54143.

34.     Defendant Chemguard, Inc. ("Chemguard") is a Delaware corporation with its principal place of business at One Stanton Street, Marinette, Wisconsin 54143.

35.     On information and belief, Chemguard acquired Williams Fire and Hazard Control, Inc. ("WFHC"). On information and belief, WFHC has and continues to sell and/or distribute AFFF throughout the United States.

36.     Defendant Chemicals Incorporated ("Chem Inc.") is a Texas corporation with its principal place of business located at 12321 Hatcherville Road, Baytown, Texas 77521.

COMPLAINT                                    - 6 -

37.    Defendant The Chemours Company ("Chemours") is a Delaware corporation with its principal place of business at 1007 Market Street, Wilmington, Delaware, 19899. On information and belief, Chemours is a successor-in-interest to DuPont Chemical Solutions Enterprise ("DuPont Chemical"), which was a Delaware Corporation, with a principal place of business located at 1007 Market Street, Wilmington, Delaware 19899.

38.    Defendant The Chemours Company FC, LLC ("Chemours FC"), successor-in-interest to DuPont Chemical Solutions Enterprise, is a Delaware limited liability company with its principal place of business located at 1007 Market Street Wilmington, Delaware 19899.

39.    Defendant Chubb Fire, Ltd. ("Chubb") is a foreign private limited company with its principal place of business at Littleton Road, Ashford, Middlesex, United Kingdom, TW15 1TZ. On information and belief, Chubb is registered in England with a registered number of 134210. On information and belief, Chubb is or has been composed of different subsidiaries and/or divisions, including but not limited to, Chubb Fire & Security Ltd.; Chubb Security, PLC; Red Hawk Fire & Security, LLC; and/or Chubb National Foam, Inc. Chubb is part of UTC Climate, Controls, & Security, a unit of Raytheon Technologies Corporation ("Raytheon") (f/k/a United Technologies Corporation).

40.    Defendant Clariant Corporation ("Clariant") is a New York corporation with its principal place of business located at 500 E. Morehead Street, Charlotte, North Carolina 28202.

41.    Defendant Corteva, Inc. ("Corteva") is a Delaware corporation with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805. On information and belief, Corteva, Inc. is one of the aforementioned spin-off companies from DowDuPont, Inc., and is believed to have assumed some of the PFAS liabilities of the former DuPont.

42.    Defendant Daikin America, Inc. ("Daikin") is a Delaware corporation with its

principal place of business located at 20 Olympic Drive, Orangeburg, New York 10962.

43.     Defendant Deepwater Chemicals, Inc. ("Deepwater") is a Delaware corporation with its principal place of business located at 196122 E County Road 40, Woodward, Oklahoma 73801.

44.     Defendant DuPont de Nemours, Inc. ("New DuPont") is a Delaware corporation with its principal place of business located at 974 Centre Road, Building 730, Wilmington, Delaware 19805. On information and belief, DowDuPont, Inc. was formed in 2017 as a result of the merger of Dow Chemical and DuPont. DowDuPont, Inc. was subsequently divided into three publicly traded companies and on June 1, 2019, DowDuPont, Inc. changed its registered name to DuPont de Nemours, Inc.

45.     Defendant Dynax Corporation ("Dynax") is a Delaware corporation with its principal place of business located at 103 Fairview Park Drive, Elmsford, New York 10523.

46.     Defendant EIDP, Inc. ("DuPont") (f/k/a E.I. du Pont de Nemours & Co.) is a Delaware corporation with its principal place of business at 974 Centre Road, Wilmington, Delaware 19805. On information and belief, Chemours is a successor-in-interest to DuPont Chemical.

47.     In 2015, DuPont spun off its "Performance Chemicals" business to Chemours, along with certain environmental liabilities. On information and belief, at the time of the transfer of its Performance Chemicals business to Chemours, DuPont had been sued, threatened with suit and/or had knowledge of the likelihood of litigation to be filed regarding DuPont's liability for damages and injuries arising from the manufacture and sale of fluorosurfactants and the products that contain fluorosurfactants.

48.     Defendant Honeywell International, Inc. ("Honeywell International") is a

COMPLAINT                                    - 8 -

Delaware corporation with its principal place of business located at 855 South Mint Street, Charlotte, North Carolina 28202.

49.    Defendant Honeywell Safety Products USA, Inc. ("Honeywell") is a Delaware corporation with its principal place of business located at 855 South Mint Street, Charlotte, North Carolina 28202. On information and belief, Honeywell is a wholly owned subsidiary of Honeywell International.

50.    Defendant Kidde PLC, Inc. ("Kidde") is a Delaware corporation with its principal place of business at One Carrier Place, Farmington, Connecticut 06034. On information and belief, Kidde was formerly known as Williams Holdings, Inc. and/or Williams US, Inc.

51.    Defendant Kidde-Fenwal, Inc. ("Kidde-Fenwal") is a Delaware corporation with its principal place of business located at 400 Main Street, Ashland, Massachusetts 01721. On information and belief, Kidde-Fenwal is the successor-in-interest to Kidde Fire Fighting, Inc. and is part of the UTC Climate Control & Security Unit of United Technologies Corporation.

52.    Defendant Nation Ford Chemical Company ("Nation Ford") is a South Carolina corporation with its headquarters located at 2300 Banks Street, Fort Mill, South Carolina 29715.

53.    Defendant National Foam, Inc. ("National Foam") is a Delaware corporation with its principal place of business at 141 Junny Road, Angier, North Carolina 27501. On information and belief, National Foam is the successor-in-interest to Angus Fire Armour Corporation. National Foam is a subsidiary of Angus International Safety Group, Ltd. On information and belief, National Foam manufactures the Angus brand of AFFF products.

54.    Defendant Tyco Fire Products LP ("Tyco") is a Delaware limited partnership with its principal place of business at One Stanton Street, Marinette, Wisconsin 54143-2542. On information and belief, Tyco is the successor-in-interest to Ansul, Inc. ("Ansul"). On information

and belief, Tyco's governing partners are citizens of Florida, Pennsylvania, and Delaware. Tyco acquired Chemguard in 2011.

55.     Defendant Raytheon is a Delaware corporation with its principal place of business at 1000 Wilson Boulevard, Arlington, VA 22209.

56.     Defendant UTC is a Delaware corporation with its principal place of business at 13995 Pasteur Blvd., Palm Beach Gardens, Florida 33418. On information and belief, UTC was formerly known as GE Interlogix, Inc. and GE Security, Inc.

## FACTUAL ALLEGATIONS

### PFAS pose a threat to human health and the environment.

57.      PFAS are a family of synthetic chemicals containing fluorine and carbon atoms. As used in this Complaint, the term "PFAS" includes all PFAS that have been or may be detected in the City's water supplies and property, including but not limited to: PFOA, PFOS, perfluorononanoic acid ("PFNA"), perfluorohexane sulfonic acid ("PFHxS"), and perfluorobutanesulfonic acid ("PFBS").

58.     PFAS have strong surfactant properties, meaning they reduce the surface tension between a liquid and another liquid or solid. For this reason, they are effective in products requiring fire resistance or oil, stain, grease, and water repellency.

59.     PFAS are in many products, including, but not limited to: firefighting foams, wire insulation, cleaners, textiles, leather, paper, and paints.

60.     PFAS are not naturally occurring. Thus, PFAS detected in the environment and in humans are attributable to human activity.

61.     Hundreds of PFAS have been manufactured, distributed, and sold in the United States.

62.     The two most widely known and studied PFAS are PFOA and PFOS.

63.     Due to their chemical structure, PFAS do not normally hydrolyze, photolyze, or biodegrade under environmental conditions, and are extremely persistent in the environment and in human tissue.

64.     PFAS also are particularly mobile in soil and water, readily absorbed into groundwater, and can migrate across long distances.

65.     Studies have shown that PFAS bioaccumulate and biomagnify in humans and wildlife.

66.     Specifically, humans may absorb PFAS from drinking water. PFAS accumulate primarily in the blood stream, kidneys, and liver.

67.     In 2009, the U.S. Environmental Protection Agency ("EPA") issued Provisional Health Advisories "to assess potential risk from exposure to [PFOS and PFOA] through drinking water," setting provisional lifetime health advisory levels of 400 parts per trillion ("ppt") for PFOA and 200 ppt for PFOS. No sampling was required until 2012.

68.     In May 2016, EPA issued lower health advisories for PFOA and PFOS warning that drinking water containing PFAS above a combined value of 70 ppt for PFOA and PFOS poses risks of adverse human health effects. EPA announced the Health Advisories on May 19, 2016, and published them in the Federal Register on May 25, 2016.

69.     In June 2022, EPA established dramatically lower drinking water interim health advisory limits ("Interim HALs") for PFOA and PFOS at .004 and .02 ppt, respectively. At the same time, EPA created two additional Health Advisories for GenX and PFBS at 10 and 2,000 ppt respectively.[3] EPA set the Interim HALs at levels below which PFOS and PFOA can be measured using current analytic methods, meaning that the mere detection of PFOS or PFOA in

---

[3] *See* Lifetime Drinking Water Health Advisories for Four Perfluoroalkyl Substances, 87 Fed. Reg. 36848 (June 21, 2022).

a water provider's system results in an exceedance of the new levels.

70.     Because recent health analyses are still undergoing final review by EPA's Science Advisory Board, the agency has stated that the new Interim HALs for PFOS and PFOA are subject to change. EPA has indicated, however, that it does not anticipate any changes resulting in revised HALs for PFOS and PFOA that are greater than the 4 ppt minimum reporting level[4] that applies to Public Water Systems.[5]

71.     In October 2021, the EPA released the "PFAS Strategic Roadmap" ("the Roadmap"), which laid out the agency's aggressive approach to regulating PFAS over a three-year period from 2021 through 2024.

72.     In March 2023, EPA proposed maximum contaminant levels ("MCLs") under the federal Safe Drinking Water Act ("SDWA") for PFOA and PFOS of 4 ppt each; it also proposed regulating PFNA, PFHxS, PFBS, and GenX under a threshold called a "Hazard Index," based on the combined concentrations of those four PFAS. 88 FR 18638. According to the Roadmap, EPA will finalize this rule by Fall 2023.

73.     In September 2022, EPA proposed a rule to designate PFOA and PFOS as hazardous substances under CERCLA.[6]Per the Roadmap, EPA has committed to finalizing this rule by Summer 2023. In April 2023, EPA also issued an advanced notice of proposed rulemaking regarding designating additional PFAS, including seven other PFAS, precursors to PFOA, PFOS, and those seven other PFAS, and/or entire categories of PFAS, as hazardous

---

[4] The Minimum Reporting Level ("MRL") for Unregulated Contaminant Monitoring Rule ("UCMR") 5 is the minimum quantitation level that, with 95 percent confidence, can be achieved by capable analysts at 75 percent or more of the laboratories using a specified analytical method. The MRLs in EPA's chart are based on the UCMR 5 requirement to use EPA Method 533.

[5] EPA, *Drinking Water Health Advisories for PFAS Fact Sheet for Public Water Systems* at 2 (June 2022), https://www.epa.gov/system/files/documents/2022-06/drinking-water-ha-pfas-factsheet-water-system.pdf.

[6] Designation of PFOA and PFOS as CERCLA Hazardous Substances, 87 Fed, Reg, 54,415 (Sept. 6, 2022).

substances under CERCLA.[7]

74.     On October 26, 2021, EPA announced that it will initiate a rulemaking to add PFOA, PFOS, GenX, and PFBS as hazardous constituents under the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 *et seq.* ("RCRA"). EPA stated that it will also issue a rulemaking to clarify that EPA's RCRA Corrective Action Program has the authority to require investigation and cleanup for wastes that meet the statutory definition of hazardous waste, which would allow EPA to take cleanup action for emerging contaminants like PFAS under the statute.

75.     These EPA actions are predicated in part on studies completed on PFAS by the Agency for Toxic Substances and Disease Registry ("ATSDR"), the U.S. Public Health Service, and the U.S. Department of Health and Human Services, which show that PFAS, including PFOA and PFOS, may adversely affect human health and the environment.

76.     For example: on June 20, 2018, the ATSDR and the U.S. Department of Health and Human Services released a draft toxicological profile for perfluoroalkyls for public comment ("2018 ATSDR Toxics Profile").

77.     The 2018 ATSDR Toxics Profile was prepared pursuant to CERCLA § 104(i), 42 U.S.C. § 9604(i), and characterizes the toxicological and adverse health effects for 14 PFAS. In it, ATSDR set provisional minimal risk levels for the PFAS analyzed. It concluded that several have long half-lives in humans, and that PFAS exposure can cause several adverse health outcomes.

78.     The 2018 ATSDR Toxics Profile explains that "EPA (2016e, 2016f) has concluded that there is suggestive evidence of the carcinogenic potential of PFOA and PFOS in humans. [The International Agency for Research on Cancer] . . . (2017) concluded that PFOA is possibly carcinogenic to humans (Group 2B)."

---

[7]  Addressing PFAS in the Environment, 88 Fed. Reg. 22,399, 22,400 (April 13, 2023).

79. Additionally, nonhuman receptors exposed to the contaminated environment are at significant risk of harm. PFOA is persistent and can cause adverse effects in laboratory animals, including cancer and developmental and systemic toxicity. PFOS is persistent, bioaccumulative, and toxic to mammalian species. PFOS is linked to developmental, reproductive, and systemic toxicity. PFOA and PFOS are also linked to immune system impacts on certain animal species (which are often used as indicators of the overall health of an ecosystem): elevated mortality in unexposed progeny of freshwater macroinvertebrates with exposure in the parental generation, disruption of the endocrine system in wildlife, and liver toxicity.

80. PFOA is also readily taken up by plants, including wild plants and crops that are grown on contaminated soil, and lead to further bioaccumulation in the food chain.

81. The State of Washington has also taken significant steps to regulate PFAS. In October 2021, Washington's Department of Ecology ("Ecology") announced that it interprets MTCA and related regulations to encompass the entire class of PFAS as hazardous. In July 2022, Ecology published recommended soil and groundwater cleanup levels for PFOA, PFOS, PFNSA, PFHxS, PFBS, and GenX. In addition, the Washington State Legislature passed a bill prohibiting the use of Class B firefighting foam containing PFAS for training purposes.

82. As of January 1, 2022, the Washington State Board of Health enacted state action levels ("SALs") for five PFAS detected in drinking water: 10 ppt for PFOA; 15 ppt for PFOS; 9 ppt for PFNA; 65 ppt for PFHxS; and 345 ppt for PFBS.

83. On January 6, 2023, the Defense Logistics Agency within the Department of Defense ("DOD") published a new Military Specification for "Fire Extinguishing Agent, Fluorine-Free Foam (F3) Liquid Concentrate, for Land-Based, Fresh Water Application," MIL-

PRF-32725 ("F3 MilSpec") in accordance with § 332(a)(1) of the FY 2020 NDAA.[8] This new specification will govern fire extinguishing foams used by all DOD organizations and will require such foams to test "non-detect" for PFAS. The specification further requires manufacturers to "certify in writing that PFAS has not intentionally been added to the concentrate."

***Since the 1960s, AFFF has been used and released into the environment, including, on information and belief, at locations including the BBCC ARFF burn facility and Grant County International Airport ("Grant Airport")***

84.     In or about 1966, the United States patented AFFF as a method for extinguishing liquid hydrocarbon fires and other fires at military bases, airports, oil refineries, and firefighting training facilities.

85.     In 1969, by command of the Navy Department and Marine Corps, DOD issued military specification MIL-F-24385 (amended subsequently), requiring AFFF liquid concentrate to contain either 3% or 6% PFAS. In MIL-F-24385, DOD refers to 3% AFFF concentrate as "Type 3" and to 6% AFFF concentrate as "Type 6."

86.     In the foam industry, concentrates are typically referred to as "3%" or "6%" concentrate, depending on the mixture rate with water (either 97% or 94%, respectively). AFFF concentrates contain about 60–90% water and have a fluorine content of about 0.3–1.8%.

87.     AFFF and other Class B fluorine-containing firefighting foams have been stored and used for fire suppression of flammable liquid fires, fire training, and flammable vapor suppression at military installations, fire-fighting training facilities, and civilian airports in the United States, including, on information and belief, BBCC, Grant Airport, and other locations throughout the City.

88.     AFFF concentrate containing PFAS is typically stored in above-ground storage

---

[8] Available on the Defense Logistics Agency's website, https://quicksearch.dla.mil/qsDocDetails. aspx?ident_number=285047.

tanks, underground storage tanks, and nonstationary containers. To use AFFF stored in this manner, the concentrate is mixed with water to make a liquid foam solution. The foam solution is then aerated at the nozzle, yielding finished foam that is then ready to be applied to a fire.

89.    AFFF is designed to coat fire, blocking its oxygen supply and creating a barrier to extinguish vapors. A film also forms to smother the fire after the foam has dissipated.

90.    Thousands of gallons of foam solution may be applied during a single AFFF release or discharge.

91.    BBCC has conducted live fire-fighting training using AFFF for over 40 years at the burn facility at Grant Airport through BBCC's ARFF program. Located at the southwestern edge of Grant Airport, the burn facility includes the fuselage of a two-engine jetliner.

92.    Grant Airport is located at 7810 Andrews Street NE, Moses Lake, WA 98837, bordering the City's geographical limit on the north, outside city limits.

93.    On information and belief, since at least 1976, BBCC has contracted with numerous airports, fire departments, and aircraft corporations, including Grant Airport and Boeing, to provide ARFF training, and has completed that training. The program his historically used ignited fuels to practice firefighting with AFFF.

94.    On information and belief, for decades, BBCC discharged AFFF to the soil and groundwater at the burn facility at Grant Airport, as was standard practice for such training facilities and other activities.

95.    The City of Moses Lake Fire Department ("MLFD") Station 1 is located at 701 E 3rd Ave, Moses Lake, WA 98837. MLFD Station 1 is approximately 5.5 miles southeast of the BBCC burn facility and is within a half mile of City Well 7.

96.    Grant County Fire District ("GCFD") 5 also has four Stations near Moses Lake:

GCFD 5 Station 1 at 11058 Nelson Road NE, Moses Lake, WA 98837; GCFD 5 Station 2 at 6184 Mae Valley Road NE, Moses Lake, WA 98837; GCFD 5 Station 4 at 7934 Valley Road, Moses Lake, WA 98837; GCFD 5 Station 8 at 1021 Arlington Drive, Moses Lake, WA 98837; 5246 Patton Boulevard NE, Moses Lake, WA 98837. GCFD Station 1 is approximately one mile south of City Well 11. GCFD Station 2 is approximately one and one-half miles northwest of City Well 31 and two and three-quarters miles south of City Well 19. GCFD Station 4 is approximately one and one-half miles southwest of City Well 24 and one mile west of City Well 9 GCFD Station 8 is approximately one-half mile southeast of City Well 21, approximately one-half mile south of City Well 23, approximately three-quarters miles north-northwest of City Well 28, and approximately one mile northwest of City Well 24.

97.     Grant Airport is less than one-half mile west of City Well 29, approximately one-half mile north of City Well 23, approximately 2 miles north of City Well 24, and approximately three miles northeast of City Well 19

98.     Boeing's property on the eastern side of Grant Airport surrounds City Well 29 and is approximately one and one-half miles northwest of City Well 23.

99.     On information and belief, AFFF has been released into the environment, including at the BBCC ARFF burn facility, Grant Airport, and other locations that used AFFF as standard industry practice (such as those identified immediately above), through a variety of practices and mechanisms including: high volume releases of AFFF during live fire training exercises; low volume releases of AFFF concentrate during storage, transfer, or equipment calibration; moderate volume discharge of foam solution for apparatus testing; high-volume, broadcast discharge of AFFF solution for fire training, fighting, suppression and prevention; and leaks from foam distribution piping between storage and pumping locations.

100.    Safety Data Sheets ("SDSs") (f/k/a Material Safety Data Sheets ("MSDSs")) require that, after AFFF foam is released, spilled, discharged, or disposed into the environment, it must be contained so it does not accumulate in sediment, soil, surface water sewers, or groundwater.

101.    If it is not contained, AFFF reverts from foam to the liquid solution of PFAS and water, and accumulates in sediment, soil, surface water and/or sewers, and groundwater.

***The BBCC ARFF burn facility and Grant Airport are within an EPA Superfund Site***

102.    Grant Airport, including the BBCC ARFF burn facility, and the surrounding area, was formerly operated as the Moses Lake Army Air Base and later Larson Airforce Base.

103.    Moses Lake Army Air Base and Larson Air Force Base operated at the current site of Grant Airport from 1942 to 1966, occupying approximately 9,600 acres.

104.    Following the closure of Larson Air Force Base in 1966, the Port of Moses Lake acquired most of the former base and began to operate Grant Airport.

105.    In 1988, the Washington State Department of Social and Health Services identified Trichloroethylene ("TCE") above the maximum contaminant level ("MCL") of 5µ/L in three City drinking water wells.

106.    Subsequent investigation by EPA and the State confirmed groundwater contamination.

107.    In 1992, EPA added the Moses Lake Wellfield Contamination Site to the Superfund program's National Priorities List.

108.    Over the last three decades, EPA and the Army Corps of Engineers have conducted cleanup and monitoring for TCE and associated contaminates at the Moses Lake Wellfield Contamination Site.

109.    Recently, EPA has begun testing and has detected PFAS, including PFOA, PFOS,

and PFHxS, in monitoring wells at the Moses Lake Wellfield Contamination Site.

110.    In May 2016, EPA tested four monitoring wells from the Moses Lake Wellfield Contamination Site for PFAS. These wells are approximately one mile southeast of the BBCC ARFF burn facility, the only known source of PFAS contamination. These wells are cross-gradient from typical groundwater flow.

111.    In August and September 2022, EPA tested an additional four monitoring wells at the Moses Lake Wellfield Contamination Site for PFAS. These wells are approximately two and a half miles east-southeast of the BBCC ARFF burn facility and are not near nor downgradient of a known source of PFAS.

112.    In April 2023, the City conducted testing for PFAS in its drinking water wells for 29 PFAS, as required by 40 CFR § 141.40 and discovered PFAS contamination, including PFOS and PFHxS, in three of its eighteen active wells: City Well 19, City Well 24, and City Well 29. City Well 19 is located over 3 miles southwest (across Moses Lake) of the BBCC ARFF burn facility. City Well 24 is over 3 miles southeast of the BBCC ARFF burn facility. City Well 29 is approximately two miles due east of the BBCC ARFF burn facility. None of these wells are near known or suspected sources of PFAS contamination.

113.    Moses Lake also tested an inactive well, City Well 23, located approximately 1.5 miles southeast of the BBCC ARFF burn facility and less than one mile south of GCIA. The City detected PFOS, PFBS, PFHxS, PFHxA, and perfluoropentanioc acid ("PFPeA") in City Well 23.

114.    The levels of PFAS detected at the foregoing wells are summarized as follows:

| PFAS Type | WA SAL (ppt) | WA GW Cleanup (ppt) | EPA HAL (ppt) | EPA MCL (Proposed) | Well 19 (City 2023) | Well 23 (City 2023) | Well 24 (City 2023) | Well 29 (City 2023) | 22BW01 (EPA 2022) | 22BW02 (EPA 2022) | MW2 (EPA 2022) | MW4 (EPA 2022) | 91AW14 (EPA 2016) | 99 BW16 (EPA 2016) | 04CW01 (EPA 2016) | 04BW04 (EPA 2016) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Near known AFFF Usage | | | | | No | Yes | No | No | No | No | No | No | Yes | Yes | Yes | Yes |
| PFOA | 10 | 10 | 0.004 | 4 ppt | ND | ND | ND | ND | 1.6 ppt | 0.9 ppt | 0.9 ppt | **5.3 ppt** | **119 ppt** | **348 ppt** | **52 ppt** | **11.2 ppt** |
| PFOS | 15 | 15 | 0.02 | 4 ppt | ND | **9.0 ppt** | **3.45 ppt** | **4.53 ppt** | **10 ppt** | ND | 1.9 ppt | 0.8 ppt | **143 ppt** | **336 ppt** | **105 ppt** | **6.3 ppt** |
| PFBS | 345 | 345 | 2000 | HQ = 2000 | ND | 2.47 ppt | ND | ND | 0.54 ppt | 1.1 ppt | 0.3 ppt | 3.2 ppt | 76.5 ppt | 162 ppt | 31.8 ppt | ND |
| PFNA | 9 | 9 | N/A | HQ = 10 | ND | ND | ND | ND | 0.6 ppt | 0.5 ppt | 0.5 ppt | 0.8 ppt | **59.2 ppt** | **20.1 ppt** | ND | ND |
| HFPO-DA | N/A | 24 | 10 | HQ = 10 | ND | ND | ND | ND | ND | ND | ND | ND | N.A. | N.A. | N.A. | N.A. |
| PFHxS | 65 | 65 | N/A | HQ = 9 | 7.5 ppt | **12.9 ppt** | ND | 3.32 ppt | 1.5 ppt | 1.0 ppt | 0.7 ppt | 4.3 ppt | **395 ppt** | **718 ppt** | **252 ppt** | **21.7 ppt** |
| PFHxA | N/A | N/A | N/A | N/A | ND | 3.39 ppt | ND | ND | N.A. | N.A. | N.A. | N.A. | N.A. | N.A. | N.A. | N.A. |
| PFPeA | N/A | N/A | N/A | N/A | ND | 2.35 ppt | ND | ND | N.A. | N.A. | N.A. | N.A. | N.A. | N.A. | N.A. | N.A. |
| Combined Hazard Index | | | | 1.0 HI | 0.8 HI | **1.43 HI** | ND | 0.4 HI | 0.2 HI | .2 HI | 0.1 HI | 0.6 HI | **49.8 HI** | **81.9 HI** | **28.0 HI** | **2.41 HI** |

Highlighted text indicates sample above HALs
**Bolded** text indicates sample above proposed MCLs
Note: The monitoring wells tested by EPA in 2016 were relatively close to the fire-fighting training site but are up or cross-gradient from the training facility.

***Defendants supplied AFFF to airports and fire-fighting training facilities.***

115.  Since the 1960s, Defendant 3M coordinated with DOD to develop AFFF meeting MIL-F-24385 specifications to extinguish fires at military bases, airports, oil refineries, and firefighting training facilities throughout the United States.

116.  Defendant 3M does business throughout the United States and is registered to do business in Washington. It developed, designed, manufactured, marketed, sold, and distributed AFFF from approximately 1964 through at least 2002. 3M's AFFF was used in fire training and response at airports and other locations throughout the country, including, on information and belief, the BBCC ARFF burn facility, Grant Airport (including all historical operations involving aeronautics and training requiring AFFF), and other locations throughout the City where AFFF was released.

117.  Between 2000 and 2002, Defendant 3M voluntarily phased out its production of some, but not all PFAS, and sold AFFF containing PFOS until approximately 2003.

118.  Defendant AGC does business throughout the United States, including in Washington. AGC designed, manufactured, marketed, and sold AFFF that was used on airports and fire-fighting training facilities throughout the United States, including, on information and belief, the BBCC ARFF burn facility, Grant Airport (including all historical operations involving aeronautics and training requiring AFFF), and other locations throughout the City where AFFF was released.

119.  Defendant AGC America does business throughout the United States, including in Washington. AGC America designed, manufactured, marketed, and sold AFFF that was used on airports and fire-fighting training facilities throughout the United States, including, on information and belief, the BBCC ARFF burn facility, Grant Airport (including all historical operations

COMPLAINT              - 21 -

involving aeronautics and training requiring AFFF), and other locations throughout the City where AFFF was released.

120. Defendant Amerex does business throughout the United States and is registered to do business in Washington. Amerex designed, manufactured, marketed, and sold AFFF that was used on airports and fire-fighting training facilities throughout the United States, including, on information and belief, the BBCC ARFF burn facility, Grant Airport (including all historical operations involving aeronautics and training requiring AFFF), and other locations throughout the City where AFFF was released.

121. Defendant Archroma Management does business throughout the United States, including in Washington. Archroma Management designed, manufactured, marketed, and sold AFFF that was used on airports and fire-fighting training facilities throughout the United States, including, on information and belief, the BBCC ARFF burn facility, Grant Airport (including all historical operations involving aeronautics and training requiring AFFF), and other locations throughout the City where AFFF was released.

122. Defendant Archroma U.S. does business throughout the United States and is registered to do business in Washington. Archroma U.S. designed, manufactured, marketed, and sold AFFF that was used on airports and fire-fighting training facilities throughout the United States, including, on information and belief, the BBCC ARFF burn facility, Grant Airport (including all historical operations involving aeronautics and training requiring AFFF), and other locations throughout the City where AFFF was released.

123. Defendant Arkema does business throughout the United States and is registered to do business in Washington. Arkema designed, manufactured, marketed, and sold AFFF that was used on airports and fire-fighting training facilities throughout the United States, including, on

information and belief, the BBCC ARFF burn facility, Grant Airport (including all historical operations involving aeronautics and training requiring AFFF), and other locations throughout the City where AFFF was released.

124.    Defendant BASF does business throughout the United States and is registered to do business in Washington. BASF designed, manufactured, marketed, and sold AFFF that was used on airports and fire-fighting training facilities throughout the United States, including, on information and belief, the BBCC ARFF burn facility, Grant Airport (including all historical operations involving aeronautics and training requiring AFFF), and other locations throughout the City where AFFF was released.

125.    Defendant National Foam does business throughout the United States, including in Washington. It developed, designed, manufactured, marketed, sold, and distributed AFFF that was used on airports and fire-fighting training facilities throughout the United States, including, on information and belief, the BBCC ARFF burn facility, Grant Airport (including all historical operations involving aeronautics and training requiring AFFF), and other locations throughout the City where AFFF was released. the BBCC ARFF burn facility and Grant Airport, from approximately 1973 through the present.

126.    Defendant Buckeye does business throughout the United States, including in Washington. From approximately 2003 through the present, Buckeye designed, manufactured, marketed, and sold AFFF that was used on airports and fire-fighting training facilities throughout the United States, including, on information and belief, the BBCC ARFF burn facility, Grant Airport (including all historical operations involving aeronautics and training requiring AFFF), and other locations throughout the City where AFFF was released.

127.    Defendant Carrier Global does business throughout the United States, including in

Washington. Carrier Global designed, manufactured, marketed, and sold AFFF that was used on airports and fire-fighting training facilities throughout the United States, including, on information and belief, the BBCC ARFF burn facility, Grant Airport (including all historical operations involving aeronautics and training requiring AFFF), and other locations throughout the City where AFFF was released.

128.    Defendant ChemDesign does business throughout the United States, including in Washington. ChemDesign designed, manufactured, marketed, and sold AFFF that was used on airports and fire-fighting training facilities throughout the United States, including, on information and belief, the BBCC ARFF burn facility, Grant Airport (including all historical operations involving aeronautics and training requiring AFFF), and other locations throughout the City where AFFF was released.

129.    Defendant Chemguard does business throughout the United States, including in Washington. It designed, manufactured, marketed, and sold PFAS-containing AFFF that was used on airports and fire-fighting training facilities throughout the United States, including, on information and belief, the BBCC ARFF burn facility, Grant Airport (including all historical operations involving aeronautics and training requiring AFFF), and other locations throughout the City where AFFF was released.

130.    Defendant Chemours does business throughout the United States and is registered to do business in Washington. It designed, manufactured, marketed, sold, and distributed AFFF that was used on airports and fire-fighting training facilities throughout the United States, including, on information and belief, the BBCC ARFF burn facility, Grant Airport (including all historical operations involving aeronautics and training requiring AFFF), and other locations throughout the City where AFFF was released.

131. Defendant Chemours FC does business throughout the United States and is registered to do business in Washington. Chemours FC designed, manufactured, marketed, and sold AFFF that was used on airports and fire-fighting training facilities throughout the United States, including, on information and belief, the BBCC ARFF burn facility, Grant Airport (including all historical operations involving aeronautics and training requiring AFFF), and other locations throughout the City where AFFF was released.

132. On information and belief, throughout the 1990s, through its association with National Foam, Defendant Chubb obtained patents (under the name Chubb National Foam, Inc.) for AFFF and similar firefighting foams, including Patent No. 5207932, dated May 4, 1993, for alcohol-resistant AFFF.

133. Defendant Chubb does business throughout the United States, including in Washington. Chubb, through its association with National Foam, designed, manufactured, marketed, and sold AFFF that was used on airports and fire-fighting training facilities throughout the United States, including, on information and belief, the BBCC ARFF burn facility, Grant Airport (including all historical operations involving aeronautics and training requiring AFFF), and other locations throughout the City where AFFF was released, during the early 2000s under the name Chubb National Foam, Inc.

134. Defendant Chem Inc. does business throughout the United States, including in Washington. Chem Inc. designed, manufactured, marketed, and sold AFFF that was used on airports and fire-fighting training facilities throughout the United States, including, on information and belief, the BBCC ARFF burn facility, Grant Airport (including all historical operations involving aeronautics and training requiring AFFF), and other locations throughout the City where AFFF was released.

135.     Defendant Clariant does business throughout the United States and is registered to do business in Washington. Clariant designed, manufactured, marketed, and sold AFFF that was used on airports and fire-fighting training facilities throughout the United States, including, on information and belief, the BBCC ARFF burn facility, Grant Airport (including all historical operations involving aeronautics and training requiring AFFF), and other locations throughout the City where AFFF was released.

136.     Defendant Corteva does business throughout the United States and is registered to do business in Washington. Corteva designed, manufactured, marketed, and sold AFFF that was used on airports and fire-fighting training facilities throughout the United States, including, on information and belief, the BBCC ARFF burn facility, Grant Airport (including all historical operations involving aeronautics and training requiring AFFF), and other locations throughout the City where AFFF was released.

137.     Defendant Daikin does business throughout the United States, including in Washington. Daikin designed, manufactured, marketed, and sold AFFF that was used on airports and fire-fighting training facilities throughout the United States, including, on information and belief, the BBCC ARFF burn facility, Grant Airport (including all historical operations involving aeronautics and training requiring AFFF), and other locations throughout the City where AFFF was released.

138.     Defendant Deepwater does business throughout the United States, including in Washington. Deepwater designed, manufactured, marketed, and sold AFFF that was used on airports and fire-fighting training facilities throughout the United States, including, on information and belief, the BBCC ARFF burn facility, Grant Airport (including all historical operations involving aeronautics and training requiring AFFF), and other locations throughout the City where

AFFF was released.

139.    Defendant DuPont does business throughout the United States and is registered to do business in Washington. DuPont designed, manufactured, marketed, and sold AFFF that was used on airports and fire-fighting training facilities throughout the United States, including, on information and belief, the BBCC ARFF burn facility, Grant Airport (including all historical operations involving aeronautics and training requiring AFFF), and other locations throughout the City where AFFF was released.

140.    Defendant New DuPont does business throughout the United States, including in Washington. New DuPont designed, manufactured, marketed, and sold AFFF that was used on airports and fire-fighting training facilities throughout the United States, including, on information and belief, the BBCC ARFF burn facility, Grant Airport (including all historical operations involving aeronautics and training requiring AFFF), and other locations throughout the City where AFFF was released.

141.    Defendant Dynax does business throughout the United States, including in Washington. Dynax designed, manufactured, marketed, and sold AFFF that was used on airports and fire-fighting training facilities throughout the United States, including, on information and belief, the BBCC ARFF burn facility, Grant Airport (including all historical operations involving aeronautics and training requiring AFFF), and other locations throughout the City where AFFF was released.

142.    Defendant Honeywell International does business throughout the United States and is registered to do business in Washington. Honeywell International designed, manufactured, marketed, and sold AFFF that was used on airports and fire-fighting training facilities throughout the United States, including, on information and belief, the BBCC ARFF burn facility, Grant

Airport (including all historical operations involving aeronautics and training requiring AFFF), and other locations throughout the City where AFFF was released.

143.    Defendant Honeywell does business throughout the United States and is registered to do business in Washington. Honeywell designed, manufactured, marketed, and sold AFFF that was used on airports and fire-fighting training facilities throughout the United States, including, on information and belief, the BBCC ARFF burn facility, Grant Airport (including all historical operations involving aeronautics and training requiring AFFF), and other locations throughout the City where AFFF was released.

144.    Defendant Kidde does business throughout the United States, including in Washington. It developed, designed, manufactured, marketed, sold, and distributed AFFF that was used on airports and fire-fighting training facilities throughout the United States, including, on information and belief, the BBCC ARFF burn facility, Grant Airport (including all historical operations involving aeronautics and training requiring AFFF), and other locations throughout the City where AFFF was released, from approximately 2000 through 2013.

145.    Defendant Kidde-Fenwal does business throughout the United States and is registered to do business in Washington. It designed, manufactured, marketed, and sold AFFF that was used on airports and fire-fighting training facilities throughout the United States, including, on information and belief, the BBCC ARFF burn facility, Grant Airport (including all historical operations involving aeronautics and training requiring AFFF), and other locations throughout the City where AFFF was released, from approximately 1991 through the present.

146.    Defendant Nation Ford does business throughout the United States, including in Washington. Nation Ford designed, manufactured, marketed, and sold AFFF that was used on airports and fire-fighting training facilities throughout the United States, including, on information

and belief, the BBCC ARFF burn facility, Grant Airport (including all historical operations involving aeronautics and training requiring AFFF), and other locations throughout the City where AFFF was released.

147.    Defendant Tyco does (and its predecessor Ansul did) business throughout the United States, including in Washington. Tyco, Ansul, and National Foam developed, designed, manufactured, marketed, sold, and distributed AFFF that was used on airports and fire-fighting training facilities throughout the United States, including, on information and belief, the BBCC ARFF burn facility, Grant Airport (including all historical operations involving aeronautics and training requiring AFFF), and other locations throughout the City where AFFF was released, from approximately 1974 through the present.

148.    Defendant Raytheon does business throughout the United States and is registered to do business in Washington. It developed, designed, manufactured, marketed, sold, and distributed AFFF that was used on airports and fire-fighting training facilities throughout the United States, including, on information and belief, the BBCC ARFF burn facility, Grant Airport (including all historical operations involving aeronautics and training requiring AFFF), and other locations throughout the City where AFFF was released, from approximately 2003 to 2013.

149.    Defendant UTC does business throughout the United States and is registered to do business in Washington. It designed, manufactured, marketed, and sold AFFF that was used on airports and fire-fighting training facilities throughout the United States, including, on information and belief, the BBCC ARFF burn facility, Grant Airport (including all historical operations involving aeronautics and training requiring AFFF), and other locations throughout the City where AFFF was released.

150.    On information and belief, Defendants developed, manufactured, marketed,

distributed, and/or sold AFFF to airports and fire-fighting training facilities at various times throughout the relevant operative period (e.g., approximately 1960 through 2018).

151. On information and belief, some Defendants continue to develop, design, manufacture, market, sell, and distribute AFFF.

**Defendants knew and failed to provide notice that AFFF was toxic.**

152. The development of this family of PFAS began with Defendant 3M in the 1940s. At that time, 3M's Central Research Laboratory worked with Joseph H. Simons, a scientist at Penn State University, who had developed and patented a process of preparing fluorine compounds through electrochemical fluorination ("ECF").

153. In 1945, 3M acquired Mr. Simons' ECF patents. Three years later, 3M's Central Research developed fluorinated compounds that could be used for commercial applications. During that time, 3M scientists continuously researched and created new fluorochemicals; in the words of one researcher, "[a]lmost every day we made a new molecule which had never been on the face of the earth before."[9]

154. Even in the early days of its fluorochemical research, 3M recognized the characteristics that make PFAS persistent pollutants in the environment. For example, Simons' 1948 patent for the ECF process, which was assigned to 3M, stated that the compounds produced through ECF are non-corrosive, and of little chemical reactivity, and do not react with any of the metals at ordinary temperatures and react only with the more chemically reactive metals such as sodium, at elevated temperatures. The patent also stated that the fluorochemicals produced by the ECF process do not react with other compounds or reagents due to the blanket of fluorine atoms

---

[9] Neil McKay, *A Chemical History of 3M: 1933-1990.* https://www.ag.state.mn.us/Office/Cases/3M /docs/PTX/PTX1365.pdf.

surrounding the carbon skeleton of the molecule.[10]

155.    3M understood that the stability of the carbon-to-fluorine bonds prevented its fluorosurfactants from undergoing further chemical reactions or degrading under natural processes in the environment.[11]

156.    The thermal stability of 3M's fluorosurfactants was also understood prior to commercial production. Simons' patent application further discloses that the fluorosurfactants produced by the ECF process were thermally stable at temperatures up to 750° C (1382° F). Additional research by 3M expanded the understanding of the thermal stability of perfluorocarbon compounds.[12]

157.    In 1949, 3M built its first manufacturing facility to expand ECF from laboratory research to commercial production, and it began to present its fluorochemical research to find potential uses and customers for these compounds.

158.    3M soon found a customer: DuPont. In 1951, DuPont began purchasing a perfluorinated carboxylic acid (perfluorooctanoic acid or PFOA), for use in manufacturing a non-stick coating called Teflon.

159.    Even in 1950, 3M's research had already documented that PFAS accumulate in the blood of mice exposed to the chemicals in laboratory tests.[13]

160.    In 1964, several DuPont employees working in Teflon manufacturing became ill

---

[10] Simons, J. H., Fluorination of Organic Compounds, U.S. Patent No. 2,447,717. August 24, 1948, https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1005.pdf.
[11] Simons, J. H., 1950. Fluorocarbons and Their Production. Fluorine Chemistry, 1(12): 401-422, https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX3008.pdf.
[12] Bryce, T. J., 1950. Fluorocarbons - Their Properties and Wartime Development. Fluorine Chemistry, 1(13): 423-462.
[13] 1950 3M test study results with Perfluorobutyric acid, https://static.ewg.org/reports/2019/pfa-timeline/1950_Mice.pdf?_ga=2.21758526.426747500.1673645134-2012946541.1673645134

after their department was moved to a more enclosed workspace.[14] They experienced chills, fever, difficulty breathing, and a tightness in the chest—symptoms referred to variously as "polymer-fume fever," "Teflon flu," or simply, "the shakes."

161.    By the end of the 1960s, additional research and testing performed by 3M and DuPont indicated that fluorosurfactants, including at least PFOA, because of their unique chemical structure, were resistant to environmental degradation and would persist in the environment essentially unaltered if allowed to enter the environment.

162.    One 3M employee wrote in 1964, "This chemical stability also extends itself to all types of biological processes; there are no known biological organisms that are able to attack the carbon-fluorine bond in a fluorocarbon."[15] Thus, 3M knew by the mid-1960s that its fluorosurfactants were immune to chemical and biological degradation in soils and groundwater.

163.    3M also knew by 1964 that fluorocarbon carboxylic acids and fluorocarbon sulfonic acids, when dissolved, dissociated to form highly stable perfluorocarboxylate and perfluorosulfonate ions. Later studies by 3M on the adsorption and mobility of FC-95 (the potassium salt of PFOS) and FC-143 (the ammonium salt of PFOA) in soils indicated very high solubility and very high mobility in soils for both compounds.[16]

164.    As documented by a research arm of the U.S. Navy in a Naval Ocean Systems Center ("NOSC") study, the military was aware of toxicity studies showing harmful PFAS effects to a variety of organisms dating back to at least 1973.

---

[14] Charles E. Lewis and Gerald R. Kerby, *An Epidemic of Polymer-Fume Fever*, 191 JAMA 375 (February 1, 1965).

[15] Bryce, H.G., Industrial and Utilitarian Aspects of Fluorine Chemistry (1964), https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX3022.pdf.

[16] Technical Report Summary re : Adsorption of FC 95 and FC143 on Soil (Feb. 27, 1978), https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1158.pdf.

165.    Also, in a 1965 study sponsored by DuPont where rats were fed a PFAS compound over a ninety-day period, the rats had liver damage and an showed an increased size in the spleen.

166.    In 1970, the authors of a scientific journal article conducted tests on a 3M product that contained PFAS and observed that it was "highly derogatory to marine life"; "the entire test program had to be abandoned to avoid severe local stream pollution."

167.    Studies undertaken by 3M in the 1970s demonstrated that PFAS were even "more toxic than was previously believed."

168.    Despite early warnings of the toxic, persistent, and bioaccumulative nature of PFOS and PFOA, these chemicals began to be used in a product that would be released in large quantities directly into the environment whenever used: firefighting foam.

169.    A 1978 study by 3M on PFOA and PFOS specifically confirmed that "these chemicals are likely to persist in the environment for extended periods unaltered by microbial catabolism."

170.    In 1979, a 3M scientist recognized that PFAS posed a cancer risk because they are "known to persist for a long time in the body and thereby give long-term chronic exposure."

171.    In the 1970s, 3M began a major program to review personnel handling of fluorochemicals. 3M's monitoring confirmed that fluorochemicals could bioaccumulate.

172.    The potential loss of profits drove 3M to engage in a deliberate campaign to influence the science relating to PFAS and, according to internal company documents, to conduct scientific "research" that it could use to mount "defensive barriers to litigation."

173.    A key priority of an internal 3M committee was to "[c]ommand the science" concerning the "exposure, analytical, fate, effects, human health and ecological" risks posed by PFAS and for 3M to provide "[s]elective funding of outside research through 3M 'grant' money."

174.    In exchange for providing grant money to researchers, 3M obtained the right to review and edit drafts of papers on PFAS and sought control over when and whether these papers were published at all.

175.    A 1985 literature survey by NOSC concluded that "usage of AFFF and the disposal of AFFF-laden wastewater have the potential for an adverse impact on the environment -- these foams are potentially toxic due to the fluorocarbons and surfactants." NOSC references toxicity studies showing impacts on a variety of organisms in the 1970s and 1980s. It also analyzes several studies conducted by 3M in 1980 showing AFFF's lethality at various concentrations across a 96-hour timeframe. NOSC concludes these "earlier studies demonstrated that a wide range of toxic concentrations exist for a variety of organisms."

176.    From the late 1960s to 2002, Defendant 3M manufactured and sold AFFF containing PFOS under the brand name "Light Water."

177.    Under pressure from EPA, on May 16, 2000, 3M announced it would phase out production of two synthetic chemicals, PFOS and PFOA, which it had developed more than 50 years earlier. On information and belief, 3M ceased production of PFOS-based AFFF in 2002.

178.    An EPA internal memo on the day of 3M's phase-out announcement stated: "3M data supplied to EPA indicated that these chemicals are very persistent in the environment, have a strong tendency to accumulate in human and animal tissues and could potentially pose a risk to human health and the environment over the long term. [PFOS] appears to combine Persistence, Bioaccumulation, and Toxicity properties to an extraordinary degree."

179.    In contrast, 3M stated in its news release on the same event that "our products are safe," while extolling their "principles of responsible environmental management" as driving the decision to cease their production.

180.     Because 3M held the patents on the ECF process, other AFFF Defendants utilized PFAS produced through a different process, called fluorotelomerization. These fluorotelomer AFFF formulations were produced beginning in the 1970s. Although they are not made with PFOA, they contain precursors—polyfluorinated compounds that are known to degrade to compounds that include PFOA.

181.     On information and belief, the AFFF Defendants designed, manufactured, marketed, distributed, and/or sold the AFFF products discharged into the environment in or near the Plaintiff water sources or facilities during fire protection, training, and response activities, resulting in widespread PFAS contamination.

182.     Defendants had a duty, which they breached, to notify EPA when they had reason to believe that a substance or mixture—such as PFAS—presented a substantial risk of injury to health or the environment.

183.     The AFFF Defendants treated their foam formulations as proprietary information and did not disclose the specific chemical ingredients of their formulations to government agencies or the public.

184.     Some or all Defendants understood how stable the fluorinated surfactants used in AFFF are when released into the environment from their first sale to a customer, yet they failed to warn their customers or provide reasonable instruction on how to manage wastes generated from their products.

185.     Prior to about 1983, no containment measures were listed in MSDSs, nor were the dangers to health or the environment inherent in AFFF disclosed in the instructions, warning labels, or product packaging for AFFF.

186.     By about 1983, MSDSs for certain AFFF products directed users to collect AFFF

COMPLAINT                                    - 35 -

before discharging to a wastewater treatment system and/or to contain liquid materials containing PFAS to prevent spilled material from reaching sewers or waterways.

187.    By 2010, SDSs for certain AFFF products directed users to contain accidental releases by stopping the flow of the material, utilizing a dike for the spilled material, and preventing entry into waterways, sewers, basements, or confined spaces. For large spill releases, SDS procedures required diking the spill for later disposal; use of noncombustible materials such as vermiculite, sand, or earth to soak up the product; and containerizing the product for later disposal.

188.    By 2010, following product recovery, SDS procedures for certain AFFF products required flushing the area with water and cleaning the surface thoroughly to remove residual contamination. MSDSs for some AFFF products provided instructions for users not to release AFFF to local wastewater treatment plant without permission.

189.    Between about 1983 and the present, the MSDSs and SDSs, instructions, warning labels, and product packaging did not fully describe or adequately warn users of AFFF health and environmental risks, or of all precautions they should take—risks and precautions that Defendants knew or should have known existed or were necessary.

190.    Commercial Service Airports, including Grant Airport, are certified by the Federal Aviation Administration ("FAA") under 14 C.F.R. Part 139, "Certification of Airports." Title 14 C.F.R. Subparts 139.315-.319 govern Aircraft Rescue and Firefighting ("ARFF") operations. The Part 139 regulations require airports to use AFFF.

191.    The FAA issues "Advisory Circulars" providing guidance to airports for complying with the Part 136 requirements. In 2004, the FAA issued Advisory Circular 150/5210-6D, which established requirements for AFFF use at Part 139 Certificated airports. AC 150/5210-6D incorporated a 1992 DOD military specification, MIL-F-24385, requiring the use of AFFF

containing perfluorinated surfactants. AC 150/5210-6D replaced the prior 1985 AC, 150/5210-6C. AC 150/5210-6C also required airports to use AFFF containing perfluorinated surfactants.

192.    Additionally, in 2016, the FAA issued Order 5280.5D, Airport Certification Program Handbook (the "Handbook"), which also establishes requirements for airports to use AFFF as part of ARFF operations. In the 2016 update to the Handbook, the FAA reaffirmed the requirement that certified airports must use AFFF containing PFAS to meet the firefighting capability requirements of Part 139. The 2016 handbook was a replacement of the 2006 Handbook, Order 5280.5C. The 2006 Handbook included the same requirements for the use of AFFF in ARFF operations. Order 5280.5C was in turn a replacement for the 1994 Handbook, Order 5280.5B, which also included requirements that ARFF operations use AFFF. In addition to using AFFF in aircraft emergencies, Part 139 Certificated Airports have historically been required to deploy AFFF when training with and testing their ARFF systems, resulting in releases of AFFF.

193.    In January 2019, the FAA issued guidance addressing the use of AFFF in testing of AFFF systems, "CertAlert" No. 19-01. This guidance provided that the FAA would thereafter accept new AFFF testing systems that do not require the actual dispensing of foam onto the ground.

194.    On January 12, 2023, following the publication of the new F3 MilSpec (see paragraph 204 above), the FAA issued "CertAlert" No. 23-01, informing Part 139 Certificated Airports that the FAA will accept the use of new fluorine-free foam ("F3") agents once the agent passes the new military performance standards, qualification testing, and is added to the Navy's Qualified Products Database.[17] Use of AFFF within Part 139 Certificated Airports' ARFF operations is expected to be completely replaced with F3 products in the near future, following

---

[17] Federal Aviation Administration, National Part 139 CertAlert No. 23-01 (Jan. 12, 2023), https://www.faa.gov/sites/faa.gov/files/part-139-cert-alert-23-01-F3_3.pdf.

FAA approval of suitable F3 replacement products. 211. On information and belief, Part 139 Certificated Airports such as Grant Airport, which are required to use AFFF in their ARFF operations, were unaware of the full extent of the environmental and health risks associated with using Defendants' AFFF and component products containing PFOA and PFOS. Across the country, the use of AFFF at airports and similar sites has been linked to widespread PFAS contamination, including of surface and groundwater, as well as public drinking water wells. BBCC was also required to use AFFF in training exercises as part of its ARFF training program.

195.    On information and belief, existing stocks of PFOA and PFOS may still be used, and PFOA and PFOS may be contained in some imported articles, at the BBCC ARFF burn facility, Grant Airport (including all historical operations involving aeronautics and training requiring AFFF), and other locations throughout the City.

196.    In the 1970s, Defendants began making AFFF that included shorter carbon chain PFAS. On information and belief, those other PFAS also are highly soluble, persistent, bioaccumulative, and toxic to humans.

197.    Although some states, including Washington, have banned the manufacture and sale of AFFF, on information and belief, some Defendants continue to develop, manufacture, and/or sell AFFF containing other PFAS compounds with six carbon atoms ("Short Chain PFAS"), rather than eight carbon atoms ("Long Chain PFAS," like PFOS and PFOA) where not expressly prohibited by law, while other defendants have phased out production of AFFF containing any PFAS.

198.    Short Chain PFAS also accumulate in blood and other tissues and will persist indefinitely in the environment, posing threats to the environment and health.

199.    Short Chain PFAS are harder to remove from the environment than Long Chain PFAS and can break through carbon filtration systems more easily.

200.    On information and belief, there are at least 24 firefighting foam products currently on the market that do not contain PFAS, including products manufactured by Angus Fire Ltd., Auxquimia, S.A.U., Dafo Fomtec AB, and The Solberg Company, which are economically and technologically feasible replacements for AFFF containing PFAS.

### FIRST CLAIM FOR RELIEF – NEGLIGENCE

201.    The City hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

202.    Defendants had a duty to manufacture and/or market, distribute, and sell their AFFF in a manner that avoided contamination of the environment, including municipal water supplies, and avoided harm to those who would foreseeably come into contact with its chemical components.

203.    Defendants knew or should have known that the manufacture of AFFF was hazardous to human health and the environment.

204.    Defendants further knew or should have known that it was unsafe and/or unreasonably dangerous to manufacture AFFF using PFAS because it was highly probable that the chemicals would migrate into the environment, including the environment at airports and fire-fighting training facilities such as the BBCC ARFF burn facility, Grant Airport (including all historical operations involving aeronautics and training requiring AFFF), and other locations throughout the City, and contaminate groundwater used as a public water supply.

205.    Knowing of the dangerous and hazardous properties of AFFF, Defendants had the duty to warn of the hazards of consuming water containing PFAS.

206.    The City was a foreseeable victim of the harm caused by the chemical components of Defendants' AFFF.

207.    Defendants negligently designed, engineered, developed, fabricated, and tested

AFFF and PFAS, negligently manufactured, and/or distributed and sold AFFF, and negligently created the associated warnings and instructions.

208.    Defendants thereby failed to exercise reasonable care to prevent AFFF and its components from presenting an unreasonable risk to the health of persons who would come in contact with them. Defendants also failed to exercise reasonable care to prevent contamination of public and agricultural water supplies, including the City's water supply.

209.    Defendants' negligent design, engineering, development, fabrication, testing, warnings, and instructions constitute a pattern of continuous and ongoing tortious conduct.

210.    Defendants have engaged and continue to engage in discrete acts of negligent design, engineering, development, fabrication, testing, warnings, and instructions.

211.    On information and belief, Defendants have not recalled their AFFF products.

212.    On information and belief, Defendants' breaches of their legal duties have caused PFAS to contaminate the groundwater beneath and around the BBCC ARFF burn facility, Grant Airport (including all historical operations involving aeronautics and training requiring AFFF), and other locations throughout the City, including groundwater in the Aquifers that constitute the City's water rights.

213.    Defendants have caused, and will continue to cause, damage to the City's property due to their negligent manufacture and/or distribution and sale of AFFF, and their negligent misrepresentation and failure to warn causing PFAS to contaminate its water supply.

214.    Defendants' negligent, reckless and/or intentional acts and omissions alleged herein contaminated the groundwater in the Aquifers with PFAS.

215.    Defendants' acts were willful, wanton, or reckless and conducted with a reckless indifference to the rights and property of the City.

216.    Defendants' conduct, and the resulting contamination of the Aquifers by the chemical components of the Defendants' AFFF, caused the City to incur significant costs.

217.    The City's costs include those to: assure water quality through the delivery system by shutting down contaminated wells; sample and analyze groundwater and other media; respond to public inquiries and manage public relations regarding the contamination; operations and maintenance associated with soil and groundwater investigations; evaluate feasibility of treatment and/or remediation options; increase the frequency of water quality testing and monitoring; manage and dispose of other media; and additional developing response costs necessary for the City to address the PFAS contamination affecting its property and rights.

218.    In addition, the City has lost the value and marketability of its property and property rights. As a result of the contamination, the City has lost use and enjoyment of its properties and suffered injury.

**SECOND CLAIM FOR RELIEF – DEFECTIVE PRODUCT – FAILURE TO WARN**

219.    The City hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if they were fully set forth herein.

220.    This cause of action is brought pursuant to Washington State statutory law to include but not limited to Chapter 7.72 RCW.

221.    Under Washington State law, "a product manufacturer is subject to liability…if the claimant's harm was proximately caused by the negligence of the manufacturer in that the product was not reasonably safe as designed or not reasonably safe because adequate warnings or instructions were not provided." RCW 7.72.030(1).

222.    Although RCW 7.72.030(1) expresses a negligence liability standard, the Washington State Supreme Court has held that "[t]he adequacy of a manufacturer's warnings are to

be measured under Washington's strict liability test." *Taylor v. Intuitive Surgical, Inc*., 389 P.3d 517, 528 (Wash. 2017) (applying strict liability standard established in *Restatement (Second) of Torts* § 402A (Am. Law Inst. 1965) to failure to warn claim).

223.    A product is not reasonably safe due to inadequate warnings or instructions if "at the time of manufacture, the likelihood that the product would cause the claimant's harm or similar harms, and the seriousness of those harms, rendered the warnings or instructions of the manufacturer inadequate and the manufacturer could have provided the warnings or instructions which the claimant alleges would have been adequate." RCW 7.72.030(1)(b).

224.    Where a manufacturer learned, or where a reasonably prudent manufacturer should have learned, about a danger connected with the product after it was manufactured, and did not then provide adequate warnings or instructions, the product is not reasonably safe. RCW 7.72.030(1)(c).

225.    In such a case, the manufacturer is under a duty to issue warnings or instructions in the manner of a reasonably prudent manufacturer in the same or similar circumstances. This duty is satisfied if the manufacturer exercises reasonable care to inform product users. *Id.*

226.    At all times relevant, Defendants were in the business of, among other things, manufacturing and/or selling and distributing AFFF.

227.    As manufacturers and/or sellers and distributors of a commercial product, the Defendants had a duty to provide adequate, full instructions, and warnings about the risks of injury posed by their products.

228.    Considering the factors related to risk, foreseeability, social utility, the burden of guarding against the harm, and the practical consequences of placing that burden on the Defendants, the Defendants owed a cognizable duty to the City not to contaminate the City's well supply, as well as the environment and groundwater in and around the BBCC ARFF burn facility,

Grant Airport (including all historical operations involving aeronautics and training requiring AFFF), and other locations throughout the City where AFFF was released, with AFFF containing dangerous levels of PFAS. They also owed the same duty to the purchasers and users of the City's water supply.

229.    The storage, use, release, and disposal of Defendants' AFFF at airports and fire-fighting training facilities, including, on information and belief, the BBCC ARFF burn facility, Grant Airport (including all historical operations involving aeronautics and training requiring AFFF), and other locations throughout the City where AFFF was released, were foreseeable. Defendants knew or should have known the likelihood that PFAS from AFFF would enter the groundwater and household water supplies, persist there for decades, cause risks to human health and the environment, and harm property.

230.    At the time of the design, manufacture and/or distribution and sale of the AFFF, Defendants knew or should have known of the dangerous properties of their AFFF.

231.    On information and belief, the Defendants at significant times failed to provide sufficient instructions and warnings to the users of AFFF, including the BBCC ARFF burn facility, Grant Airport. As a result, users were unaware that use and release of Defendants' AFFF to the environment would contaminate groundwater, including drinking water and agricultural water supplies, and cause risks to those exposed to the water supplies.

232.    On information and belief, the Defendants failed to provide adequate instructions and warnings to users that AFFF contamination of the groundwater and soil would pose dangers to human health and the environment at significant times.

233.    Defendants' failure to provide adequate instructions and warnings constitutes a pattern of continuous and ongoing tortious conduct.

234.   On information and belief, Defendants failed and continue to fail to provide adequate instructions and warnings, and have not recalled their AFFF products.

235.   Adequate instructions and warnings would have reduced or avoided the foreseeable risks of harm posed by the use and release of AFFF.

236.   Had Defendants provided adequate warnings, BBCC and Grant Airport would not have used AFFF or would have taken measures to store, use, discharge, and dispose of AFFF to reduce or eliminate groundwater and soil contamination.

237.   Defendants' failure to warn against the likelihood of contamination from their AFFF caused its chemical components, including PFAS, to contaminate the groundwater in the Aquifers.

238.   Defendants' failure to warn of the environmental and health impacts caused by releasing their AFFF and the chemical components of their AFFF directly and proximately caused PFAS to contaminate the groundwater in the Aquifers, causing the City to lose the use and benefit of its property and to incur costs to treat the groundwater and soil on its lands.

239.   Defendants' failure to provide adequate warnings or instructions renders Defendants' AFFF a defective product.

240.   Defendants' conduct, and the resulting contamination of the Aquifers by the Defendants' AFFF, caused the City to incur significant costs.

241.   The City's costs include those to: assure water quality through the delivery system by shutting down contaminated wells; sample and analyze groundwater and other media; respond to public inquiries and manage public relations regarding the contamination; operations and maintenance associated with soil and groundwater investigations; determine feasibility of treatment and/or remediation options; increase the frequency of water quality testing and monitoring; manage and dispose of other media; and additional response costs.

242. In addition, the City has lost the value and marketability of its property and property rights.

**THIRD CLAIM FOR RELIEF – DEFECTIVE PRODUCT – DESIGN DEFECT**

243. The City hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

244. This cause of action is brought pursuant to Washington State statutory law, including but not limited to Chapter 7.72 RCW.

245. Under Washington law, "a product manufacturer is subject to liability…if the claimant's harm was proximately caused by the negligence of the manufacturer in that the product was not reasonably safe as designed or not reasonably safe because adequate warnings or instructions were not provided." RCW 7.72.030(1).

246. "A product is not reasonably safe as designed, if, at the time of manufacture, the likelihood that the product would cause the claimant's harm or similar harms, and the seriousness of those harms, outweighed the burden on the manufacturer to design a product that would have prevented those harms, and the adverse effect that an alternative design that was practical and feasible would have on the usefulness of the product." RCW 7.72.030(1)(a).

247. At all times relevant, Defendants were in the business of, among other things, manufacturing, selling, and/or distributing AFFF.

248. It was foreseeable that toxic chemicals from the AFFF that Defendants manufactured and/or sold and distributed would enter the water supplies of the City and cause damage to its property interests.

249. Alternative designs and formulations of AFFF were available, technologically

feasible and practical, and would have reduced or prevented the reasonably foreseeable risks of harm to the City.

250.     Further, design, formulation, manufacture, and/or distribution and sale of a product containing chemicals that were so toxic, mobile, and persistent in the environment was unreasonably dangerous.

251.     The AFFF manufactured and/or distributed and sold by Defendants was defective in design because the foreseeable risk of harm posed by the AFFF could have been reduced or eliminated by the adoption of a reasonable alternative design, and because it was unreasonably dangerous.

252.     Defendants' products were defective at the time of manufacture and/or distribution and sale, and thus at the time they left Defendants' control.

253.     Defendants' sale and distribution of AFFF constitutes a pattern of continuous and ongoing tortious conduct.

254.     On information and belief, Defendants have sold and distributed, and continue to sell and distribute, AFFF in a tortious manner.

255.     On information and belief, Defendants have not recalled their AFFF product.

256.     Defendants' manufacture and/or distribution and sale of a defectively designed product caused PFAS to contaminate the Aquifers and to damage the City.

257.     Defendants' design, formulation, manufacture and/or distribution and sale of a defective product render Defendants strictly liable in damages to the City.

258.     Defendants' acts were willful, wanton, or reckless and conducted with a reckless indifference to the rights of the City.

259.     Defendants' conduct, and the resulting contamination of the Aquifers by the chemical

components of the Defendants' AFFF, caused the City to incur significant costs.

260.   The City's costs include: assure water quality through the delivery system by shutting down contaminated wells; sample and analyze groundwater and other media; respond to public inquiries and manage public relations regarding the contamination; operations and maintenance associated with soil and groundwater investigations; determine feasibility of treatment and/or remediation options; increase the frequency of water quality testing and monitoring; manage and dispose of other media; and additional response costs.

261.   In addition, the City lost the value and marketability of its property and property rights.

### FOURTH CLAIM FOR RELIEF – NUISANCE

262.   The City hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

263.   Defendants' manufacture and/or sale and distribution of AFFF constituted intentional, negligent, and/or unreasonably dangerous activity causing the unreasonable and substantial interference with the use and enjoyment of the property interests of the City.

264.   Given the chemical properties of PFAS in AFFF, Defendants knew and/or should have reasonably foreseen that using AFFF at the BBCC ARFF burn facility, Grant Airport (including all historical operations involving aeronautics and training requiring AFFF), and other locations throughout the City where AFFF was released as they intended would result in an invasion of the City's property interests, including obstruction of its use of its water supplies. Through their actions described above, Defendants participated in carrying out the nuisance described above within the meaning of, *inter alia*, Chapter 7.48 RCW.

265.   The unreasonable and substantial interference with the use and enjoyment of the

City's property interests includes, but is not limited to: the contamination of groundwater and soil on the City's property, including the source of the City's appropriated water rights; the need to shut down contaminated wells and rely on remaining wells for the City's water; and the exposure to known toxic chemicals manufactured and/or sold and distributed by Defendants.

266.    Defendants' sale and distribution of AFFF constitutes a pattern of continuous and ongoing tortious conduct.

267.    On information and belief, Defendants have and continue to sell and distribute AFFF in a tortious manner to the date of this Complaint.

268.    PFAS continue to contaminate the City's properties and continue to migrate to the City's properties.

269.    The nuisance caused by Defendants resulted in, and continues to result in, contamination of the City's groundwater supplies.

270.    Defendants' creation of a nuisance caused and is causing substantial and unreasonable interference with the City's property rights.

271.    Defendants' acts were willful, wanton, or reckless and conducted with a reckless indifference to the rights and property of the City.

272.    Defendants' conduct, and the resulting contamination of the Aquifers by the chemical components of the Defendants' AFFF, caused the City to incur significant costs.

273.    The City's costs include: assure water quality through the delivery system by shutting down contaminated wells; sample and analyze groundwater and other media; respond to public inquiries and manage public relations regarding the contamination; operations and maintenance associated with soil and groundwater investigations; determine feasibility of treatment and/or remediation options; increase the frequency of water quality testing and monitoring; manage

and dispose of other media; and additional response costs.

274.     In addition, the City lost value and marketability of its property and property rights.

## FIFTH CLAIM FOR RELIEF – UNJUST ENRICHMENT

275.     The City hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

276.     Defendants profited from the manufacture and/or distribution and sale of AFFF and continued to do so long after they were aware of the health and environmental risks of their products. Further, on information and belief, Defendants have failed to recall their products to prevent the further release of their AFFF into groundwater and onto the City's properties. Through Defendants' actions and inaction, the Defendants have been unjustly enriched at the expense of the City.

277.     Defendants' enrichment is both unjust under the circumstances and as between these parties. *Puget Sound Security Patrol, Inc. v. Bates*, 396 P.3d 709, 717 (Wash. App. 2017). The City has sustained millions of dollars in damages as a direct result of Defendants' failure to recall their products. Defendants profited from those sales. The City's resulting damages include, but are not limited to: loss of use and enjoyment of its property rights, loss of value of its property and rights, the cost of shutting down contaminated wells, and the cost of monitoring and potentially treating groundwater contaminated with PFAS, including increased water quality testing and monitoring. These damages necessitate an equitable remedy.

278.     The City asks the Court to award the expenditures saved and the profits obtained by Defendants at the expense of the City as a remedy.

## SIXTH CLAIM FOR RELIEF – DECLARATORY JUDGMENT

279.     The City hereby incorporates by reference the allegations contained in the preceding

paragraphs of this Complaint as if fully set forth herein.

280.    The Court has jurisdiction to award declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*

281.    An actual, present, and existing dispute exists between the City and Defendants. The parties have genuine and opposing interests, which are direct and substantial, relating to Defendants' liability and responsibility for the City's damages incurred, and the future costs that the City will incur to abate the continuing PFAS migration and contamination from the BBCC ARFF burn facility, Grant Airport (including all historical operations involving aeronautics and training requiring AFFF), and other locations throughout the City where AFFF was released.

282.    The possibility of the City incurring future costs necessary to abate the continuing PFAS migration and contamination from the BBCC ARFF burn facility, Grant Airport (including all historical operations involving aeronautics and training requiring AFFF), and other locations throughout the City where AFFF was released is not unlikely, remote, or speculative.

283.    The City is entitled to entry of a judgment declaring that Defendants are liable for damages and future costs necessary to abate the continuing PFAS migration and contamination from the BBCC ARFF burn facility, Grant Airport (including all historical operations involving aeronautics and training requiring AFFF), and other locations throughout the City where AFFF was released, under Washington common law and federal statutory law. Such judgment shall be final, conclusive, and binding on any subsequent action or actions to recover further response costs or damages.

284.    The City further requests that this Court, after entering the declaratory judgment prayed for herein, retain jurisdiction over this action to grant the City such further relief against Defendants as is necessary and proper to effectuate the Court's declaration, including an award of

costs and entry of an injunction to implement a judgment entered on the City's claims under 28 U.S.C. § 2202.

## SEVENTH CLAIM FOR RELIEF – MTCA AND DECLARATORY JUDGMENT

285.    The City incorporates all averments in this Complaint as if restated fully herein.

286.    Defendants are persons as defined in RCW 70A.305.020(24).

287.    Under RCW 70A.305.020(13), the PFAS disposed of, deposited, and/or handled at the BBCC ARFF burn facility, Grant Airport (including all historical operations involving aeronautics and training requiring AFFF), and other locations throughout the City where AFFF was released are "hazardous substances," as all types of PFAS are "hazardous substances" under MTCA. WAC 173-303-090—100.[18]

288.    The BBCC ARFF burn facility, Grant Airport, and every place at which AFFF came to be located in the City including its drinking water supplies, constitute a "facility" as defined in RCW 70A.305.020(8).

289.    Defendants are persons who sold hazardous substances and, on information and belief, were responsible for written instructions for their use within the meaning of RCW 70A.305.040(1)(e).

290.    On information and belief, the releases of hazardous substances at the BBCC ARFF burn facility, Grant Airport (including all historical operations involving aeronautics and training requiring AFFF), and other locations throughout the City where AFFF was released occurred according to the instructions provided by Defendants.

291.    A release is "any intentional or unintentional entry of any hazardous substance into

---

[18] *See also* Wash. Dep't of Ecology, *Focus on PFAS*, Pub. No. 21-09-060 (Oct. 2021), https://apps.ecology.wa.gov/publications/documents/2109060.pdf.

the environment, including but not limited to the abandonment or disposal of containers of hazardous substances." Wash. Admin. Code § 173-340-200. The use of hazardous substances at the BBCC ARFF burn facility, Grant Airport (including all historical operations involving aeronautics and training requiring AFFF), and other locations throughout the City where AFFF was released constituted, and continue to constitute, releases for which remedial investigation and action has been and will continue to be necessary at the facility within the meaning of RCW 70A.305.040(1)(e).

292.     Defendants are liable persons as defined in RCW 70.305.040(1)(e).

293.     These releases caused and will continue to cause the City to take and/or fund "remedial actions" as defined in RCW 70A.305.020(33).

294.     These remedial investigations and actions are and will continue to be, when evaluated as a whole, substantially equivalent to remedial action conducted or supervised by Ecology.

295.     The Defendants' sale of hazardous substances and provision of instructions on the use of said substances have resulted in the City incurring remedial action costs and s' fees, and have further resulted in the City's need to incur future costs, including attorneys' fees, as a result of those actions.

296.     Pursuant to RCW 70A.305.040(2) and RCW 70A.305.080, Defendants are strictly, jointly, and severally liable for any and all past and future costs related to the investigation and remediation of hazardous substances released at or from the facility, including any costs or attorneys' fees relating to releases or threatened releases of hazardous substances at, on, or from the facility.

297.     Under RCW 70A.305.080 and RCW 7.24.010, the City is entitled to a declaratory

judgment that Defendants are strictly and jointly and severally liable for any and all past and future costs related to the investigation and remediation of hazardous substances released at the facility, including any costs or attorneys' fees incurred by the City relating to releases or threatened releases of hazardous substances at, on, or from the facility.

## NINTH CLAIM FOR RELIEF – WASHINGTON CONSUMER PROTECTION ACT (MANUFACTURER DEFENDANTS)

298.    The City hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

299.    Manufacturer Defendants' manufacturing, marketing, promoting, distributing, and sale of AFFF Products constitute "trade" or "commerce" within the meaning of the CPA, RCW 19.86.010(2).

300.    Manufacturer Defendants engaged in unfair and/or deceptive acts or practices within the meaning of RCW 19.86.020 by, inter alia, representing that their AFFF Products were safe while misrepresenting and omitting risks and complications associated with their AFFF Products.

301.    Manufacturer Defendants also engaged in unfair and/or deceptive acts or practices within the meaning of RCW 19.86.020 by, inter alia, omitting and/or failing to update their information and marketing materials with known, material risks associated with the use of AFFF Products.

302.    Manufacturer Defendants' misrepresentations were deceptive because they have the capacity to mislead a substantial number of consumers.

303.    These acts or practices occurred in trade or commerce because they occurred in connection with the sale of AFFF to BBCC, the Port of Moses Lake, and others, and such sale directly and indirectly affected the people of the City.

304.    An act or practice may be unfair if it offends public policy; is immoral, unethical, oppressive, unconscionable; or causes injury to consumers. Manufacturer Defendants' acts or practices as alleged in this Complaint are unfair.

305.    Manufacturer Defendants' acts and practices injured the City and its property by foreseeably causing the City's drinking water supply to be contaminated by AFFF and forcing the City to incur substantial response costs.

### TENTH CLAIM FOR RELIEF – UNIFORM VOIDABLE TRANSACTIONS ACT (UVTA DEFENDANTS)

306.    The City incorporates all averments in this Complaint as if restated fully herein.

307.    The City seeks equitable and other relief pursuant to the Uniform Voidable Transactions Act, as adopted by the State of Washington under RCW chapter 19.40, against E. I. du Pont de Nemours and Company, The Chemours Company, The Chemours Company FC, LLC, Corteva, Inc., and DuPont de Nemours, Inc. (collectively, the "UVTA Defendants").

308.    By 2013, E. I. du Pont de Nemours and Company ("Old DuPont") faced mounting liabilities arising out of its long-running manufacture, use, marketing, distribution, and sale of PFOA and/or its chemical precursors throughout the country. These liabilities included, among other things, clean-up costs, remediation obligations, tort damages, natural resources damages, and potential punitive damages.

309.    On information and belief, by 2013, in order to shield its assets from these liabilities and make itself a more appealing merger partner, Old DuPont began to consider and/or engage in a complex series of corporate restructurings and spin-offs.

310.    In or around 2014, Old DuPont formed The Chemours Company as a wholly-owned and operated subsidiary. Shortly thereafter, Old DuPont transferred its "Performance Chemicals"

business (which included Teflon® and other products, the manufacture of which involved the use of PFOA and other PFAS) to Chemours.

311.    At the time of the transfer of its Performance Chemicals business to Chemours, Old DuPont had been sued, threatened with suit, and/or had knowledge of the likelihood of litigation to be filed regarding Old DuPont's liabilities for damages and injuries arising from its manufacture and sale of its PFAS products, including AFFF, PFOA, and PFOA's chemical precursors.

312.    On information and belief, prior to the spinoff, Chemours was a wholly-owned subsidiary of Old DuPont, and its four-member Board of Directors consisted of three Old DuPont employees and a former member of Old DuPont's Board of Directors. Then, effective immediately prior to the spinoff, the Chemours Board of Directors doubled in size, the three Old DuPont employees resigned, and seven new members were appointed to fill the vacancies. This new Chemours Board of Directors did not take part in negotiating the Separation Agreement.

313.    In or around July 1, 2015, Old DuPont completed the spin-off of Chemours as a separate public entity and saddled Chemours with Old DuPont's massive PFAS liabilities.

314.    Although many of the details of the Separation Agreement remain hidden from the public, on information and belief, as part of the Separation Agreement, Chemours accepted broad assumption of Old DuPont's environmental liabilities arising out of its long-running manufacture, use, discharge, marketing, distribution, and sale of PFAS.

315.    Additionally, Chemours agreed to assume for itself, and indemnify Old DuPont against, all liabilities relating to or arising from the operation of the Performance Chemicals business at any time and regardless of which entity is named in any action or against whom such liabilities are asserted or determined.

316.    Further, Chemours agreed to assume for itself and indemnify Old DuPont from all

environmental liabilities that arose prior to the spinoff if Old DuPont reasonably determined that 50.1% of the liabilities were attributable to the Performance Chemicals business.

317.    On information and belief, the value of the assets Chemours transferred to Old DuPont was substantially more than the value of the assets it received from Old DuPont, and Chemours assumed billions of dollars of Old DuPont's PFAS and other liabilities.

318.    Old DuPont knew that Chemours was undercapitalized and unable to satisfy the massive liabilities that it assumed from Old DuPont. In addition to the assumption of such liabilities, Chemours was required to provide broad indemnification to Old DuPont in connection with these liabilities, which is uncapped and does not have a survival period.

319.    In or around December 2015, Old DuPont entered into an agreement with Dow, Inc. ("Old Dow") pursuant to which Old DuPont and Old Dow merged with subsidiaries of a newly formed holding company, DowDuPont, Inc. ("DowDuPont"), which was created solely for the purpose of effectuating the merger. Old DuPont and Old Dow became subsidiaries of DowDuPont.

320.    Following its creation, DowDuPont engaged in a number of realignments and divestitures, the details of which remain largely hidden from Plaintiff and other creditors, intended to frustrate and/or hinder creditors with claims against Old DuPont. On information and belief, the net effect of these transactions was the transfer, directly or indirectly, of a substantial portion of Old DuPont's assets to DowDuPont for far less than these assets were worth.

321.    By 2019, DowDuPont spun-off two new publicly traded companies, Corteva, Inc. and Dow, Inc. ("New Dow"). DowDuPont was then renamed DuPont de Nemours, Inc. ("New DuPont").

322.    On information and belief, Corteva currently holds Old DuPont as a subsidiary.

323.    On information and belief, as part of the DowDuPont Separation Agreement,

Corteva and New DuPont also assumed direct financial liability of Old DuPont that was not related to the Agriculture, Material Science, or Specialty Products Businesses, including the PFAS liabilities which are allocated on a pro rata basis between Corteva and New DuPont.

324.    On information and belief, through the transfer of assets and liabilities described in this Complaint, the UVTA Defendants have attempted to limit the availability of assets to cover judgments for all of the liability for damages and injuries from the manufacture and sale of its fluorosurfactant products described herein.

325.    On information and belief, the UVTA Defendants (a) acted with intent to hinder, delay and defraud parties, or (b) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and (i) were engaged or were about to engage in a business for which the remaining assets of Chemours were unreasonably small in relation to the business; or (ii) intended to incur, or believed or reasonably should have believed that Chemours would incur, debts beyond its ability to pay as they became due, within the meaning of RCW 19.40.041 and RCW 19.40.051.

326.    On information and belief, the UVTA Defendants engaged in acts in furtherance of a scheme to transfer DuPont's assets out of the reach of parties, including the City, that have suffered injury as a result of the actions as described in this Complaint.

327.    On information and belief, UVTA Defendants acted without receiving a reasonably equivalent value in exchange for the transfer of obligations, and DuPont knew, or reasonably should have known, that Chemours would incur debts beyond its ability to pay as they became due.

328.    The City seeks to avoid the transfer of DuPont's liabilities for the claims brought in this Complaint and to hold the UVTA Defendants jointly and severally liable for any damages or other remedies that may be awarded by this Court or a jury under this Complaint.

329.    The City further reserves such other rights and remedies that may be available to it

as may be necessary to fully compensate the City for the damages and injuries it has suffered as alleged in this Complaint.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment against Defendants, and each of them, jointly and severally, and grant the City the following relief:

a) An award to the City of all damages suffered, or that will be suffered, as a result of Defendants' actions, including, without limitation: costs to take PFAS-contaminated wells offline; costs to build, operate, and maintain filtration and treatment systems for the City's contaminated wells, including those to install pipelines and other infrastructure; costs to manage water quality; costs to collect and analyze samples of groundwater, soil, and other media; costs to investigate and remediate aquifers; costs to manage public relations and public inquiries relating to PFAS contamination of City drinking water; costs of lost profits and lost customers; the decrease in the value and marketability of the City's property and property rights; the loss of use and enjoyment of the property and property rights; the identification and procurement of alternative water sources as needed; remediation of soil contaminated with PFAS in the City to prohibit its migration to groundwater; and the annoyance, discomfort, and inconvenience caused to the City by Defendants' PFAS releases to the environment—in an amount to be proven at trial;

b) An award to the City, in an amount to be determined at trial, commensurate to the amount of an order for disgorgement of the profits and savings which were obtained by the unjust enrichment of Defendants through their manufacture and/or distribution and sale of AFFF;

c) A declaration that the Defendants are liable for damages suffered by the City to date, and for costs to be incurred by the City in the future to abate the continuing PFAS migration

COMPLAINT                                    - 58 -

and contamination from the BBCC ARFF burn facility, Grant Airport, and any other areas where AFFF was used or released to the environment (i.e., potentially, City of Moses Lake Fire Station No. 1, and Grant County Fire District 5 Stations 1, 2, 6, and 8);

d)  An order awarding to the City its attorneys' fees and costs, as provided by law;

e)  An order voiding the Chemours Transfers and the DuPont Transfers to the extent necessary to satisfy Plaintiff's claims;

f)  An order enjoining New DuPont from distributing, transferring, capitalizing, or otherwise transferring any proceeds from the sale of any business lines, segments, divisions, or other assets that formerly belonged to Old DuPont;

g)  An order imposing a constructive trust over any such proceeds for the benefit of the Plaintiff;

h)  An award of treble damages, as provided by law;

i)  An award to the City of pre- and post-judgment interest, as provided by law; and

j)  An order and award to the City for all such other and further relief, including equitable and declaratory, as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b) the City demands a trial by jury on all claims so triable.

Respectfully submitted on June 6, 2023.


MARTEN LAW, LLP


By:  */s/ Jessica K. Ferrell*
Jessica K. Ferrell, Bar No. 36917
1191 Second Ave, Suite 2200
Seattle, WA 98101
(206) 292-2600
(206) 292-2601 fax
jferrell@martenlaw.com


*/s/ Bryce M. Brown*
Bryce M. Brown, Bar No. 225511
1050 SW 6th Ave, Suite 2150
Portland, OR 97204
(503) 241-2650
(503) 243-2202 fax
bbrown@martenlaw.com


Attorneys for City of Moses Lake